Larry L. PAGE and the Christian Civic Action Committee
*v.* W. J. "Bill" McCUEN, In His Official Capacity as
Secretary of State of the State of Arkansas

Mike.Wilson, Indiv. and on Behalf of
the Committee to Promote Arkansas, *Intervenors*

Delta Resorts Limited Partnership, *Intervenor*

94-922                                            884 S.W.2d 951

Supreme Court of Arkansas
Opinion delivered October 20, 1994
[Rehearing denied October 28, 1994.*]

---

*Dudley, J., and Special Justice William Enfield, would grant rehearing. Hays and
Brown, JJ., not participating.

*Williams & Anderson*, by: *Leon Holmes*, for petitioners.

*Winston Bryant*, Att'y Gen., by: *John D. Harris*, Asst. Att'y Gen., for respondent.

*Dover & Dixon, P.A.*, by: *David A. Couch* and *Philip E. Dixon*, for intervenors Mike Wilson, individually and on behalf of the Committee to Promote Arkansas.

*Mitchell, Williams, Selig, Gates & Woodyard, A Professional Limited Co.*, by: *Sherry P. Bartley, John Selig*, and *Marshall S. Ney*, for intervenor Delta Resorts Limited Partnership.

TOM GLAZE, Justice. This case represents the third ballot title matter submitted for our review for the 1994 General Election. The first case was *Bailey* v. *McCuen*, Case No. 94-951 (opinion delivered October 14, 1994) where the court held two things wrong with the title, namely, (1) it omitted a legal rule used in construing workers' compensation laws and the rule would change, requiring the courts to construe workers' compensation laws "lib-

erally" rather than "strictly" and (2) it failed to mention that legal fees payable on appeals are presently limited by law but would not be limited under the proposed amendment. The second case where this court invalidated the ballot title was in *Christian Civic Action Committee* v. *McCuen*, Case No. 94-881 (opinion delivered October 14, 1994). There, the court decided the title was misleading because it used the euphemistic phrase "additional racetrack wagering" when referring to the establishment of what would amount to gambling casinos at existing racetracks in Hot Springs and West Memphis. We noted that the drafters had used the terms "casinos" and "gambling houses" in telling the voters what would be *prohibited* at other locations.

In the present case, petitioners challenge the ballot title of a proposed amendment which, by popular name, is to authorize one casino in Crittenden County, create an Arkansas Casino Gaming Commission and permit the levy of casino taxes to fund crime prevention and law enforcement. Petitioners contend the title is designed in a manner that the voter will be unable to make an intelligent choice, fully aware of the consequences of his vote, by reading the ballot title while in the voting booth. Intervenors, Mike Wilson and Delta Resorts Limited Partnership, disagree, and argue the title summarizes the basic purposes and provisions of the proposal and the voter would be able to cast his or her ballot with a fair understanding of the proposal.

The proposal here is forty pages long. It comprises twenty-three sections and more than 150 sub-sections to describe its purposes. In preparing the ballot title, with the Attorney General's assistance, the drafters used 587 words in their attempt to convey to the voter a fair understanding of the issue. *See Ferstl* v. *McCuen*, 296 Ark. 504, 758 S.W.2d 398 (1988). For comparison purposes, the ballot titles in *Bailey* and *Christian Civic Action Committee I*, contained 706 and 709 words respectively and those two cases involved proposals nowhere near the length or complexity as the one now before us.

Obviously, in drafting the ballot title for Amendment 5 here, the sponsors could not possibly cover the entire proposal because, if they had, the voter would have found it impossible to read, understand and cast his or her vote on the issue while at the polling precinct. As a consequence, the sponsors were nec-

essarily forced to omit portions of the proposal when preparing the ballot title. We hold that some of those omissions were important for a fair understanding of the amendment and would give the voter "serious ground for reflection" on whether to vote for the measure. *Hoban* v. *Hall*, 229 Ark. 416, 316 S.W.2d 185 (1958).

One of the most serious omissions in the ballot title concerns the important substantive language contained in Section 12 of the proposal. That section reads, "Casino gambling shall be lawful and casino/resort development shall be considered appropriate land use in Crittenden County at a location described as:

> That part of Section 3, Township 6 North, Range 9 East that lies North of the Burlington-Northern Railroad right-of-way and West of the St. Francis Levee District levee right-of-way; and that part of Section 34, Township 7 North, Range 9 East lying South and East of the drainage canal known as Drainage Ditch No. 2 and West of the St. Francis Levee District levee right-of-way, all of which is situated in Crittenden County, Arkansas."

The foregoing provision specifies a *known* piece of land owned by unnamed individuals. Nonetheless, the measure's ballot title states only that the measure authorizes the establishment of one casino "at *a* designated site" in Crittenden County to be operated by a gaming licensee "who can demonstrate ownership of the designated land."

Any voter reading the ballot title, and being unaware of the specific legal description contained in the measure, would unwittingly be led to believe that "a designated site" is yet to be selected. Not so. The constitutional measure, if approved, guarantees some owner of a known and legally described parcel of property in Crittenden County the right to establish and operate a casino. Before casting their ballots, voters no doubt would pause for reflection if they were aware "the" designated site had already been established in the proposed constitutional measure itself, thereby guaranteeing the site's owner whatever benefits that would result from the measure's passage.

Another example of the ballot title not reflecting substantive and important provisions contained in the proposed

amendment involves Section 11.C, which sets forth the general powers of the Casino Gaming Commission. Twenty-nine (29) subsections are listed, most setting forth numerous powers in detail. A majority of those subsections are not mentioned in the ballot title. For example, Section 11.C.8 empowers the commission "to issue subpoenas and compel the attendance of witnesses for its meetings and investigations, to hold hearings, to administer oaths and to require testimony under oath." In addition, the commission can initiate proceedings or actions to enforce provisions of Amendment 5 and then recommend those persons being investigated to be prosecuted for violations not only of any provision of Amendment 5 but of state law, too. A state grand jury has no greater powers. Furthermore, section 11.C.16 gives the commission authority to make any investigation necessary to determine whether there has been any violation of the proposed amendment *or any regulations adopted* thereunder. These undisclosed powers of the commission would give any disinterested voter serious ground for reflection.

A third serious ballot title omission concerns Sections 9 and 11.C.14 which provide as follows:

> Section 9. The Casino Gaming Commission shall require the casino gaming licensee to work with the Casino Gaming Commission to provide training programs for Arkansas residents so that they may be qualified applicants for positions within the casino gaming establishment opened pursuant to this Amendment. These training programs may be operated through post-secondary vocational schools, colleges and universities currently existing in the state.

> Section 11.C.14. The *gaming activities of schools or training institutions* regulated by the Casino Gaming Commission *shall be* deemed to be *legal* under the laws of the State of Arkansas. (Emphasis added.)

Although the ballot title reflects that training programs may be provided through existing post-secondary vocational schools, colleges or universities, it contains nothing to reflect that gaming activities conducted at these state institutions are made legal by the proposal. In sum, we have no hesitancy in stating the Arkansas voters, especially those residing where voca-

tional schools, colleges and universities exist, would determine it important, when casting their ballots, to know that gaming activities will be legal in their communities.

Other substantive and misleading ballot title omissions could be listed, but the foregoing examples suffice. Neither *Christian Civic Action* nor *Bailey* involved the type of serious omissions presented here. The Amendment 5 sponsors' choice or insistence in covering the establishment and operation of casino gaming in so much detail can be said to have sounded the proposal's own death knell. Here, proposed Amendment 5 is so all-encompassing that to include every important factor of the proposal in the ballot title would cause the ballot title to be so complex, detailed and lengthy that the Arkansas voter could not intelligently make a choice on the title within the five minutes allowed in the voting booth. *Cf. Dust* v. *Riviere, Secretary of State*, 277 Ark. 1, 638 S.W.2d 663 (1977); *see also Gaines* v. *McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988); Ark. Code Ann. § 7-5-522(d) (Repl. 1993). Although Amendment 7 to the Arkansas Constitution does not specify a limit on the length of a proposal, the proposed measure must be of a size capable of having a ballot title which will not only convey the scope and import of the measure, but also impart a description of the proposal so voters can cast their votes intelligently and with a fair understanding on the issue. In sum, proposed Amendment 5 is so expansive that it precludes the writing of an acceptable ballot title.

For the reasons given above, we hold Amendment 5's ballot title deficient. Petitioner's request for relief is granted, and the Secretary of State is enjoined from canvassing and certifying any returns on Amendment 5.

We point out at this stage that, during this 1994 election year, the court has been presented with more initiative and referendum measures and other election-issue cases than it has had in any past election year. Time constraints have not permitted us the deliberative time we would have liked when deciding such important matters. In 1989, the General Assembly passed Act 280 in an effort to provide timetables that would permit the early review of ballot titles. In a 4-3 decision, this court invalidated the Act, holding its provisions conflicted with Amendment 7. *See Finn* v. *McCuen*, 303 Ark. 418, 798 S.W.2d 34 (1990).

We commend the General Assembly's past effort in attempting to establish reasonable statutory timetables to implement initiative and referendum measures under Amendment 7. We respectfully ask its further consideration and action and encourage the General Assembly to make another attempt to establish an initiative and referendum procedure that will permit early resolution of such issues. Until appropriate action is taken to correct the problems attendant to proposals submitted under Amendment 7, citizens can continue to expect measures to be removed from the ballot immediately prior to the election. This court does not enjoy being in the "last-minute" position of review. The people of Arkansas deserve an initiative and referendum procedure which allows them the confidence that measures, after having been adequately reviewed, will not be removed from the ballot. The sponsors of initiative proposals should also be assured their ballot titles and proposed measures meet required guidelines and rules before they spend their time, energy and monies in getting their proposal before the voters.

The mandate is ordered issued within five days from the filing of this opinion unless a petition for rehearing is filed.

DUDLEY, J. and SPECIAL JUSTICE ENFIELD dissent; SPECIAL JUSTICE BROWN concurs.

HAYS and BROWN, JJ., not participating.

GERALD BROWN, Special Justice, concurring. The pros and cons of legalized gambling are not a part of this proceeding.

While, on the surface, this appears to present a ballot title issue, even a cursory reading of proposed Amendment 5 discloses a much more serious problem: the visceral damage which its adoption would inflict on our constitution and, indeed, on our system of government by constitution.

I start with the premise that some things simply do not belong in a constitution.

My approach to the issue here involved (the role of a constitution in a constitutional form of government) is so simplistic that no citation of authority is necessary.

I realize that the learned members of this court need no his-

tory lesson, and none is intended, but sometimes it is helpful to harken back to basics.

Simply put, a constitution is a set of basic fundamental laws setting forth broad general principles by which people desire to be governed — an outline of the power that the people are willing to grant to the government — a skeletal directive from the people, leaving it to the legislative and executive branches of government to flesh out and implement. The judicial branch decides whether the constitutional goals are being met. If not, legislative remedies are available. Since constitutional changes are purposely difficult, specific detailed instructions should not be included. The constitution is not a "how to" manual.

The Attorney General's Office is the first line of defense in preserving the character of our constitution. It filters from proposed amendments impurities which would pollute the process of government by constitution.

This court should preserve the integrity of our constitution by denying ballot access to proposed amendments which pollute it. Vigilance is required because pollution is insidious and incremental.

As the majority opinion points out, proposed Amendment 5 is too long, too detailed, to be susceptible to abridgment in a sufficiently informative ballot title. If the people of Arkansas desire to legalize gambling, that goal can be accomplished without constitutionalizing a monopoly and doing violence to the concept of constitutional government. The people can express that desire in a simple, straightforward manner and leave it to the legislature to implement, thereby preserving government by constitution, rather than government by Commission.

The power to protect the Constitution of the State of Arkansas is lodged only in this Court. Some pollution has already crept into our constitution, but the huge dose now being served up by proposed Amendment 5 is too much to gulp down in one swallow. Nibbling away at the edges is destructive enough, but a massive, frontal assault must be repelled.

I join the majority in requesting the General Assembly to continue its search for a solution to this troublesome problem. In

the interim, I strongly feel that this Court should keep our constitution sufficiently free of debris so that all public officials can proudly raise their right hands and swear (or affirm) to uphold it.

I concur with the majority opinion in granting the petition.

ROBERT H. DUDLEY, Justice, dissenting. In this original action petitioners seek to prohibit the Secretary of State from certifying the November 1994 general election results of the proposed constitutional amendment named "An Amendment to Authorize One Casino in Crittenden County, to Create the Arkansas Casino Gaming Commission, and to Levy Casino Taxes to Fund Crime Prevention and Law Enforcement." The majority of the court votes to grant the petition and enjoin the Secretary of State from certifying the results of the election on the proposal. I respectfully dissent.

## I.

## THE HOLDINGS OF THE MAJORITY OPINION

The majority opinion grants the petition for four reasons: (a) the location of the proposed casino as described in the ballot title is misleading; (b) important provisions about the powers of the Gaming Casino Commission are omitted from the ballot title; (c) the ballot title fails to disclose that the proposal would allow gaming statewide; and (d) the text of the proposal is so expansive that an intelligible ballot title cannot be written.

## A.

The majority opinion correctly states that the text of the proposed amendment provides that a casino would be located on a particular tract of land in Crittenden County and correctly states that the ballot title provides that the casino would be located at a designated site. The majority opinion then concludes that the ballot title is somehow inconsistent with the text of the proposal, and the ballot title is therefore misleading. The conclusion is fallacious.

The text of the proposal states that there is to be one casino, and it is to be located on a described tract of land in Crittenden County. The ballot title provides that it is "AN AMENDMENT TO THE ARKANSAS CONSTITUTION AUTHORIZING THE

ESTABLISHMENT OF THE ONE CASINO *AT A DESIGNATED SITE IN CRITTENDEN COUNTY* TO BE OPERATED UNDER A RENEWABLE THREE YEAR LICENSE BY A QUALIFIED, BONDED CASINO GAMING LICENSEE *WHO CAN DEMONSTRATE OWNERSHIP OF THE DESIGNATED LAND*." The ballot title plainly states that one casino would be authorized at a designated site. The text of the proposal and the ballot title are consistent. There is nothing misleading about this provision in the ballot title.

The petitioners do not even argue that this part of the ballot title is misleading. In fact, the petitioners tacitly admit that this part of the ballot title is clear because they contend that the misleading provision in this part of the ballot title is that it does not disclose the fact that the sponsor of the proposal, Mike Wilson, has acquired an option on the only site where the casino would be located.

The ballot title is not misleading because it provides that the casino will be located "at a designated site in Crittenden County."

## B.

The majority opinion next holds that the ballot title omits full disclosure of important powers of the Casino Gaming Commission. Again, I cannot agree.

The powers of the Casino Gaming Commission are disclosed in the ballot title. The part of the ballot title relating to the powers of the Commission is as follows:

> CREATING THE ARKANSAS CASINO GAMING COMMISSION WHICH SHALL CONSIST OF FIVE (5) MEMBERS TO BE APPOINTED BY THE GOVERNOR, TO SERVE FIVE (5) YEAR TERMS; PROVIDING FOR REAPPOINTMENT OF THE COMMISSIONERS ONLY ONCE; PROVIDING FOR REMOVAL OF COMMISSIONERS DURING THEIR TERM BY THE GOVERNOR WITH A CONCURRENCE OF THE GENERAL ASSEMBLY; PROVIDING FOR STATE POLICE BACKGROUND CHECKS ON PROSPECTIVE COMMISSIONERS AND OTHERWISE ESTABLISHING QUALIFICATIONS FOR

THE OFFICE; PROVIDING THAT THE COMMISSION SHALL BE FUNDED INITIALLY BY A LOAN OF STATE FUNDS TO BE REPAID WITHIN TWO (2) YEARS OF THE LOAN, AND THEREAFTER EXCLUSIVELY BY A ONE PERCENT ASSESSMENT ON GROSS REVENUES OF THE CASINO AND FEES PAID BY PROSPECTIVE LICENSEES; EMPOWERING THE COMMISSION TO SUPERVISE THE CASINO GAMING AUTHORIZED BY THIS AMENDMENT, INCLUDING THE POWER TO REQUIRE LICENSES AND STATE POLICE BACKGROUND CHECKS ON PERSONS SEEKING TO CONDUCT CASINO GAMING, SUPPLY EQUIPMENT TO AN ARKANSAS CASINO, OR BE EMPLOYED BY SUCH SUPPLIERS, OR AT THE CASINO IN CASINO GAMING ACTIVITY, AND THE POWER TO SUBJECT LICENSED GAMING EMPLOYEES TO ALCOHOL AND DRUG TESTING; EMPOWERING THE COMMISSION TO AUDIT ALL BOOKS AND FISCAL RECORDS OF THE CASINO.

The majority opinion holds that the foregoing part of the ballot title contains a material omission since it does not specify that the Commission would have the power to subpoena witnesses and compel them to attend meetings and investigations of the Commission. Such reasoning ignores the fact that the ballot title clearly provides that the Commission would have the authority to supervise all casino gaming authorized by the amendment, would have the authority to conduct investigations into persons, books and records associated with the proposed casino, and would have the authority to examine for violations of the amendment and the Commission's regulations. A voter reasonably would be expected to view the Commissioners' powers in such context and surely would expect the Commission to have the power of subpoena to carry out its specified duties. Contrary to the suggestion in the majority opinion, the text of the proposal would not give the Commission the authority to compel witnesses to testify regarding any matter that might be of interest to them, but rather they could be subpoenaed only on matters relating to casino gaming. When one reads the ballot title provisions about the powers of the Commission, it is difficult to believe that a voter would be given "serious ground for reflection" because the power of

subpoena is not mentioned. *See Hoban* v. *Hall*, 229 Ark. 416, 316 S.W.2d 185 (1958).

Further, two of our cardinal rules in deciding this issue are: (1) A ballot title is sufficient if it identifies the proposed act and fairly alleges its general purpose. *Coleman* v. *Sherrill*, 189 Ark. 843, 75 S.W.2d 248 (1934); (2) not every detail of an amendment or how it will work in every situation need be revealed in the ballot title. *Fertsl* v. *McCuen*, 296 Ark. 504, 758 S.W.2d 398 (1988). We should follow our established rules.

## C.

The third reason stated in the majority opinion for granting the petition is that the ballot title is misleading because it does not inform the voters that it would authorize statewide gambling. Again, I cannot agree because the proposal simply does not authorize gambling statewide. It authorizes gambling at one location, and it separately authorizes training programs for gaming employees, which could be conducted throughout the State. The two provisions are separate and distinct.

## 1.

Gambling is authorized at only one location. Section one of text of the proposed amendment provides, "Casino gaming is hereby permitted at a single site in the State of Arkansas as specified in Section 12." A "casino gaming establishment" is defined under section 2(C) as "the facility operating at the site described in Section 12." Section 12(A) provides, "Casino gaming shall be lawful and casino/resort development shall be considered appropriate land use in Crittenden County at a location described as: [metes and bounds description], all of which is situated in Crittenden County, Arkansas." Part (C) of section 12 states that "[n]o more than one (1) casino gaming establishment shall be permitted to operate at the location described in Section 12(A)." Section three of the proposed amendment provides that "[g]aming may only be conducted by the licensed owner of a casino or a manager designated by the licensed owner and approved by the Casino Gaming Commission." Section 13 (D)(1)(d) states that the Casino Gaming Commission shall issue a casino gaming license to an applicant who demonstrates "by clear and convincing evidence that the applicant currently owns land at the

single site that has been approved for casino gaming by this Amendment, as set forth in Section 12." These express provisions authorize only one casino, and its location is fixed.

### 2.

The majority opinion disregards the clear language of the proposal and focuses on a provision for training programs and concludes that these provisions, taken together, would allow gambling statewide.

The proposal makes it very clear that there would be only one casino, and it is to be located at a particular site in Crittenden County. Section 9 then provides that the Casino Gaming Commission shall require the holder of the license for the casino to work with the Commission to provide training programs for employees. It further provides that those training programs may be conducted at vocational schools, colleges, and universities currently existing in the State. Section 11.C.14 provides that the commission shall:

> Adopt rules and regulations necessary to regulate all schools or training institutions that teach or train gaming employees. The gaming activities of schools or training institutions regulated by the Casino Gaming Commission shall be deemed to be legal under the laws of the State of Arkansas. Any person desiring to operate a school or training institution must be licensed by the Casino Gaming Commission.

Without the provision deeming the "training programs" for "gaming activities" of the schools to be legal, the schools would be in violation of the provisions of the criminal code, which make it criminal to set up, keep or exhibit gaming tables and gaming devices. *See* Ark. Code Ann. §§ 5-66-103—104 (Repl. 1993). Without the provision there would be no exemption from the Johnson Act, 15 U.S.C. §§ 1171 & 1172 (1988 & Supp. 1993). The Johnson Act's main purpose is to aid states in local enforcement of antigambling laws by prohibiting interstate and certain intrastate transportation of gambling devices. Section 1172(a) provides that it shall not be unlawful to transport in interstate commerce any gambling device into any state in which the transported gambling device is specifically enumerated as lawful in that state. If Arkansas law did not contain the above training pro-

vision in the proposed amendment, it would be illegal under both federal and state law for a school in Jonesboro, Little Rock, or some other city outside Crittenden County, to train mechanics on the repair of a gambling device.

In summary, section one of the text provides that casino gaming would be permitted at only one site and that is the site specified in Section 12. Section 2(c) defines a casino as the facility operating *at the described site.* Section 2(d) defines *gaming* as a game of chance located *exclusively within a casino.* Since gaming is defined as a game located exclusively within a casino and since a casino is defined as the facility at the single site, casino gambling would be permitted only at the single site and nowhere else. The "teaching programs" of "gambling activities" at the school sites simply does not authorize gambling statewide as the majority opinion holds. "Gambling" occurs when one plays a game of chance for money or other stakes. *See Portman* v. *State*, 204 Ark. 349, 162 S.W.2d 67 (1942). The teaching of "gambling activities" does not authorize the winning or losing of money or other stakes at the training schools.

## D.

In its most far-reaching holding the majority opinion takes from the people of Arkansas a constitutional right by requiring a proposed measure to be short so that the ballot title can be simple. The holding has some appeal for all of us, but it is clearly in violation of the provisions of Amendment 7 to the Arkansas Constitution. The first paragraph of Amendment 7 provides:

> The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people *reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution*, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option, to approve or reject at the polls any entire act or any item of an appropriation bill. [Emphasis added.]

A subsequent paragraph provides:

> No limitation shall be placed upon the number of con-

stitutional amendments, laws, or other measures which may be proposed and submitted to the people by either initiative or referendum petition as provided in this section.

Under the plain language of the amendment the people have reserved unto themselves the power to propose any legislative or constitutional measure, regardless how wise or ill-advised, and regardless how long or short. The duty of this court under the amendment is not to judge the merits of the proposal, but rather to see that the ballot title is intelligible, honest, and impartial. *Ferstl* v. *McCuen*, 296 Ark. 504, 758 S.W.2d 398 (1988).

The constitutional right of the people to initiate any measure they chose should not be abridged. The first reason is obvious and needs no discussion: the constitution should be followed. However, there are other reasons for dissenting from the holding. Amendment 7 refers to initiated acts, as well as constitutional proposals. Many acts are long and, at times, cover even hundreds of pages. The holding apparently means that the people have lost the right to initiate a long complex act, such as a probate code or a criminal code. The people have lost the right to bypass the general assembly. The people have lost the right to put items in the constitution that, in the mind of the court, do not belong there. Such a holding is the antithesis of the intent of Amendment 7.

## II.

## THE HOLDING OF THE CONCURRING OPINION

The concurring opinion joins in the result of the majority opinion. The basis of the concurring opinion is that the text of the proposed amendment is so long and so detailed that it is like legislation. While I can clearly understand the proposition and have some sympathy for it, I cannot agree with it.

The opinion should not be followed for a number of reasons. First, the petitioners have not made such an argument. The issue has not been briefed by either of the parties. Neither party discussed the length of the text. Our judicial system is based on the adversarial process, and judges are dependent in a great part on attorneys developing each side of an issue. Because of this American tradition, courts do not usually strike off on their own and decide cases on grounds not argued. Without question, an

important issue such as this should not be decided without arguments on both sides.

Second, the reasoning of the concurring opinion, as well as the majority opinion, will bring about a paradoxical result. Ballot titles are required for measures initiated by the public, but they are not required for measures submitted to the public by the general assembly. *Becker* v. *Riviere*, 277 Ark. 252, 641 S.W.2d 2 (1982). Under the reasoning employed in both the concurring majority opinions, the public cannot propose lengthy and complex matters for adoption, while the general assembly can so do. Such a result is directly in conflict with the purposes of Amendment 7, which reserves to the people the power to enact any proposal that the general assembly might enact.

Arguments can be made that Amendment 7 was rashly adopted by the people. The fact that the Constitution of the United States contains no such provision supports the argument that such a process could allow the majority to become a tyranny over the minority. But those arguments are immaterial to the issue before us. The people have in fact adopted Amendment 7, and it gives the people an unlimited right to the initiative process. That right should be taken away only by a vote of the people.

### III.

### CONCLUSION

The three holdings of the majority opinion that the proposed amendment contains misleading statements and omits material issues are important to the people involved, but at least those holdings affect only this case. To the contrary, the holding that the text of an initiated proposal must be comparatively short affects all future initiated proposals, whether they be initiated acts or initiated constitutional amendments, and it clearly takes away a right assured to the people under the Initiative and Referendum Amendment to the constitution. There is nothing in Amendment 7 that can be fairly construed as placing any limit upon the length, complexity, or subject matter of an initiated proposal. The issue has not been briefed. It has not been argued. This case has been expedited for immediate decision. The result is that an expedited edict of this court takes away a constitutional right.

ENFIELD, Special Justice, joins in this dissent.